The first case on our regular argument calendar for today is O'Kane v. Plainedge Union Free School District, number 193446. Mr. Ricotta. Good morning. May I proceed? Yes, please. Thank you. We bring this appeal of a portion of the lower court's summary judgment, granting of summary judgment. The focus of our appeal is on the 1983 hospital work environment claim. The court here, we feel, erred in that the court held that hospital work environment claim under Monell liability could not be established or considered based on complaints that were made by the plaintiff to the superintendent of the school district. We believe that was an error. We believe not considering that complaint and solely basing a theory of Monell liability on an email that was sent to a board member is an error that warrants reversal of summary judgment. I'm jumping in a little early, perhaps. I'm sorry. Maybe you can address this because it's directly on your point. Is Superintendent Salina a policymaker or not? It seems to me that Superintendent Salina carries out the policy of the Board of Education, and it's the Board of Education that's the policymaker. Well, I believe there's sort of a distinction in that the board is the final decision maker, but I believe superintendents are considered final policymakers, and we cite in our brief. Counsel, superintendent can be final decision makers, but what evidence, what have you suggested in this case that says that this superintendent is a final decision maker? That's my problem. Because there are some situations where they are, but there are some situations where they're not. And what is it that you show us here that suggests that this one is? Absolutely. So the testimony that plaintiff provided, and that's within the appendix A-309, there's some gaps in it, but it's roughly between 309 and 315 where he discusses his complaint to the superintendent. He brings this caricature, which was sort of the straw that broke the camel's back in terms of everything that he had been dealing with. And he brings that to the superintendent, and he says, you know, essentially enough is enough. Look at this. This is offensive to me, to my core, you know, of who I am, you know. And the superintendent at that point says, this is disgraceful. I'm going to address this. I'm going to investigate this. So that alone is the evidence that the superintendent, the superintendent didn't say, this is something for the board to look into. This is something for the board to review. This is something you should take to someone else. The superintendent said, I will address this. This is unacceptable. And that's within that testimony and that conversation that Mr. O'Kane had with the superintendent. So I think that that is your evidence that in this instance, the superintendent in terms of the day-to-day operation of a district and reviewing and conducting investigations into allegations of discrimination, the superintendent is a final policymaker. The idea that the only way someone would be able to, within a school district environment, make a complaint that, if it's not addressed, would then create a Monell liability or any liability if that complaint is made to a member of the board is just, I don't think realistic or in conformance with the law here. You know what I mean? If we were to assume that the superintendent, Selena, was a policymaker for the sake of argument here, my understanding is from the testimony that after Mr. Selena said he would get to the bottom of it, that the caricature was not acceptable, that your client then declined his offer and said, I have to deal with this myself. I'm going to go talk with Dylan. And so I kind of called off Mr. Selena. Mr. Selena then did mention it to Dylan. And Dylan had already spoken with Selena about it when Mr. O'Kane went. So even if we agree that he is a policymaker, you have to show some kind of deliberate indifference, I believe, to the complaint. And I don't think you have shown that. Have you? I think we have. I don't respectfully, Your Honor, I don't agree with that recitation of the facts. I don't believe that Mr. O'Kane did not want an investigation done or that he called off an his part that in October, so a couple of months after he spoke with the superintendent and the superintendent indicated he would take care of this, this was unacceptable, and he would investigate this, that he followed up with a member of the district saying, hey, what's going on with that investigation? And then that's also further established by the email that he sends in 2015 to the former board member, which, again, I'm not arguing for the purposes of this. That is a complaint that establishes notice because it just so happens that the plaintiff didn't know that that board member left the board a month or two prior. But that email further shows that factual concept that he did not want or believe that the district was addressing this and pursuing an investigation into what was happening to him is just not the case. He always was, and he was pressing as to what was going on, even as late as August 2015, as he was preparing to potentially come back to work because he had been out due to an injury. So, this is Judge Walker. I want to understand the nature of the hostile work environment here. My understanding is that there were co-workers who on occasion made derogatory comments to O'Kane Irish faggots and that kind of thing. And O'Kane estimated that this occurred once or twice a year between 2011 and 2013. So, it would have been about four to six times spread out over a three-year period. And then, and that was a co-worker. And then that Dylan once asked in one other instance, was his response to a question, an Irish answer, an American answer and gave him, apparently your client testified, a look of disdain. And then there was the business of the caricature. How is that a hostile work environment of the gravity that is normally required to find a liability? So, the one piece, Your Honor, that I think you didn't include, which I think is very relevant and helps to create a hostile work environment, certainly for the purposes of summary judgment, where we're analyzing whether a reasonable jury could find that this created a hostile work environment. And that's that his supervisor, Dylan, regularly referenced his accent and would mock his accent as a joke. So, that was something. So, in addition to him being called, and for the purposes of the oral argument, I mean, calling him a fucking Irish faggot, he said it happened once or twice a year from 2011 through 2013. He also had a supervisor that would regularly mock and comment about his accent and national origin, which the testimony for that is A334. And then he also had, you know, the other comment that you made about, is that American answer or is that an Irish answer? And then that, on top of the caricature then being posted, which Mr. O'Kane testified to, that was something that, you know, I mean, for me, not being an Irish individual, you know, it's hard for me to see that, to look at that and how severe that is. But for Mr. O'Kane, as an Irish individual, that caricature that basically, you know, attributes every single, like, negative, you know. Okay. I understand what you're saying. The test is, of course, an objective one. It's not a subjective one. And that's the way we would have to look at it. But in addition to that, there's a follow-up question here. Your client then went to Selena and also raised the issue with Dylan. But he didn't raise the hostile work environment issue. He raised the caricature issue. The hostile work environment was never presented as a hostile work environment to these two people. And so I don't quite understand how you can say that the hostile work environment was the responsibility of a policymaker if the superintendent was a policymaker. So I think the answer to that is, and I think the law is really clear that a layperson, like an employee, doesn't, there's no magic words they have to provide. They just have to put the employer on notice. And so the plaintiff's testimony was after receiving... What he was put on notice about was the caricature, not anything more. Well, I wouldn't agree with that, Your Honor. Again, it was within the context of that site that I gave before, but it's around A314 to A315. He asked, did you discuss your national origin in connection with this caricature at all during your conversation with Dr. Selena? I believe it was brought up. Yes, I believe I said to him, this is making me out like a drunk or something. It's against my whole being, my whole inside. I was furious. I was shaking. Counsel, that alone would not be a hostile work environment. You would agree to that. Just that. Talking about the caricature and relating it to the fact that he's Irish. I think that the caricature alone, I think there's certainly a viable argument. There's an argument that that alone would not create a sufficiently severe hostile work environment, that it rises to the level of a hostile work environment. I don't think that where there's cases such as Absolutely. Yes, I'm sorry. Please wrap up. We've kept you well past your time. No problem. What I would say is inciting that testimony. He says, I felt it was, of course, against my national origin. I don't believe that the standard and the threshold for the plaintiff when he reports in an act of a hostile work environment or that would constitute in the law hostile work environment, that he has to cite everything or sufficiently establish a hostile work environment within that complaint. I think here. All right. I think I think we have the argument. You'll be able to follow up on rebuttal. We'll hear from Mr. Dorfman, please. Good morning. Can you hear me? Yes. Yes. Yeah. Good morning. May it please the court. My name is Leo Dorfman. I represent the Plain Edge Union Free School District in this matter. I want to start off just by addressing maybe the last thing that Mr. Ricotta said about this bit of testimony about the conversation with the superintendent, Dr. Salina. Mr. O'Kane's actual testimony was I felt that it was, of course, against my I felt that it was, of course, against my national origin question. Did you say that to Dr. Salina answer? I believe I may have said that to or something similar question. Do you have a specific recollection one way or the other answer? No, I don't. I was just too angry, to be honest. So there is no evidence in the record, one, that he raised his national origin in his conversation with Dr. Salina. Of course, it's correct that even if he had, he never reported a hostile work environment. And so putting aside even for a moment, the question of whether the superintendent was a final policy maker for these purposes, we have to take it one step further. One, did he report a hostile work No, he did not. And two, did the superintendent or the school district or the school board cause the hostile work environment? And there is no evidence anywhere to support the notion that they did. In fact, after this drawing was placed on Mr. O'Kane's windshield in August of 2014, just a couple of months later, he went out on disability leave and he stayed out on disability leave until his position was eliminated the following year. There is no indication anywhere that there was any kind of hostility of any sort after this drawing was placed. Can you address the incident generally, though? You argue that Mr. O'Kane rejected Superintendent Salina's offer to help with respect to the incident. But it looks like there's evidence to suggest that O'Kane reasonably expected that the superintendent would conduct an investigation. He made some gestures in that way afterwards, even though O'Kane said he also wanted to get to the bottom of it. It seems like a fairly aggressive incident. It may signal some other concerns and that the superintendent did very little about it. Why is that enough to suggest there might be deliberate indifference? Well, the evidence in the record, Your Honor, is that after Mr. O'Kane spoke to the superintendent and the superintendent offered to help, Mr. O'Kane said, I'm going to get to the bottom of this. And instead of having the superintendent do an investigation, he took the matter then to Dr. Dillon and spoke to Dr. Dillon about it. When he took it off... The superintendent of responsibility, I mean, this was going on on his watch in his school district that people were treating Mr. or someone treated Mr. O'Kane in this way. I'm not sure that relieves him of the obligation. He says, I'm going to get to the bottom of this. He doesn't do much. Judge, we dispute the notion that he said, I'm going to get to the bottom of this. I don't think that the superintendent, when he saw the drawing, saw the same thing in this drawing that Mr. O'Kane did. And it's the superintendent's testimony and Dr. Dillon's testimony that the first notion that they got that someone considered the drawing discriminatory or offensive in a way that would raise equal protection concerns was when this lawsuit was filed. As it was Mr. O'Kane... But isn't that a problem? Because if we look at that drawing and we think that it is something that would raise this, wouldn't a person who wasn't indifferent have seen it too? Not necessarily, your honor. I think two people can look at a drawing and see two different things. Well, but if you're getting to not necessarily, you're getting into questions that may be questions of fact. You know, who can say? But I have a question if I could, Judge Walker. And that is, let's assume that there was deliberate indifference to the caricature. If the was a hostile work environment, there can be no claim that he was deliberately indifferent to a hostile work environment that he didn't know about. And under those circumstances, and that's the only issue in the case, isn't it? That's being raised, it's being pressed here. This was a hostile work environment situation. There wasn't any other sort of discrimination. So that's where I'm hung up. But maybe, actually, I probably, Brad, your adversary might want to address that. And just to dovetail off that, your honor, not only does there have to be some showing that the superintendent was aware of a hostile environment and was deliberately indifferent to it, that both were reported to him and that he was deliberately indifferent to it, but then that deliberate indifference at that point caused some further hostile environment to occur. And there's no evidence of that either. It didn't happen. But when you say caused, that could be permitted to continue in the sense that it became clear that no one was going to get punished or sanctioned for engaging in discriminatory behavior or harassment. Do you agree? I agree that that would qualify, but we don't have that here either. All right. Very good. There was no hostility that postdated the conversation. I'm sorry. Is that Judge Walker? Yeah. He made the point that I was about to ask, which is that there's no activity after the conversation that would have consisted of part of a hostile work environment. That's right. Very good. Mr. Dorfman, you want to wrap up, please? I think unless there are any further questions, I'm quite satisfied and done. Thank you. Very good. And we'll hear Mr. Ricotta's rebuttal. You have two minutes, Mr. Ricotta. Thank you, Your Honor. So addressing that last point, what I would say is that the facts, certainly the most favorable to the plaintiff is that after his complaint, the conduct continued unabated. There's no evidence that ever stopped. And in fact, plaintiff says that the comments, particularly the comments in the mocking of his accent, was something that continued regularly throughout the time that he was there. So what you have is you have a complaint and then nothing being done to address it. And as a result, there being a continued conduct that may be in and of itself. I thought the conduct was between 2011 and 2013. That was what, Your Honor, that was his reference to him being called an effing Irish, you know. But as far as the constant derisiveness about his accent that he says, and I think it's within the papers that that was a regular thing that regularly occurred. I do want to point out, too, that when we're talking about whether the superintendent was on notice of this being a work environment claim, I mean, the testimony that that Mr. O'Kane provides is that, and this is on A318, that the superintendent told him, Patrick, I will get to the bottom of this for you. This is not acceptable in the district that I am the superintendent of. And so he knew that this was inappropriate. You know, I mean, the idea that this would have looked at. Accepting that it was inappropriate, this one incident was certainly inappropriate. One could agree with that. And he may have been deliberately indifferent to this one incident. But how was he deliberately indifferent to a hostile work environment of which this was only a part and it was the only part he knew about? It was only one incident. Well, because if he had conducted a full investigation and actually responded to this, Your Honor, then arguably the other actions would have been uncovered and they would have been You know, that's not the law. What is being brought to the attention of a policymaker? And so the policymaker can then act on the basis of that and a judgment can be made about deliberate indifference. Sure, but I would make a corollary argument. I don't think what the law would say is that if you go to someone and complain about a hostile work environment, for example, if someone is being sexually harassed and there were five incidents, but they only report one, that the other incidents are not then still considered part of that hostile work environment if nothing is done to address that incident that was reported. And here, what I would say is while Mr. O'Kane does testify that he, you know, and again, he does say it was years ago, so I was mad. I don't recall exactly what I said, but I believe this is what I said. The caricature on its face clearly relates to an Irish individual and his national origin. And at some point, there's a caricature that depicts an Irish individual. They put his name on it. It depicts him as a drunk, sort of like leprechaun type, you know, character. And he and the superintendent review this and agree that it is unacceptable. You know, I mean... Ricardo, thank you. I think we have the arguments. Thank you. We will reserve decision. Thank you very much for your arguments. Thank you.